Slip Op. 16-62

## UNITED STATES COURT OF INTERNATIONAL TRADE

TMK IPSCO ET AL.,

> Plaintiffs and Consolidated
> Plaintiffs,

and

MAVERICK TUBE CORPORATION ET AL.,

> Plaintiff-Intervenors and
> Consolidated Plaintiff-
> Intervenors,

v.

UNITED STATES,

> Defendant,

and

TIANJIN PIPE (GROUP) CORP. ET AL.,

> Defendant-Intervenors and
> Consolidated Defendant-
> Intervenors.

Before: Claire R. Kelly, Judge

Consol. Court No. 10-00055
Public Version

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the countervailing duty investigation of certain oil country tubular goods from the People's Republic of China.]

Dated: June 24, 2016

Roger Brian Schagrin, Schagrin Associates, of Washington, DC, argued for plaintiffs TMK IPSCO, V&M Star L.P., Wheatland Tube Corp., Evraz Rocky Mountain Steel, and United Steelworkers.  With him on the brief was John Winthrop Bohn.

Alan Hayden Price and Robert Edward DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, for consolidated plaintiff and plaintiff-intervenor Maverick Tube Corporation.

Jonathan Gordon Cooper, Quinn Emanuel Urquhart & Sullivan, LLP, of Washington, DC, argued for consolidated plaintiff and plaintiff-intervenor United States Steel Corporation. With him on the brief were Jon David Corey and Susan Rachael Estrich.

Loren Misha Preheim, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant United States.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Shelby Mitchell Anderson, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Daniel Lewis Porter, Claudia Denise Hartleben, Matthew Paul McCullough and William Henry Barringer, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for defendant-intervenors Tianjin Pipe (Group) Corp. and Tianjin Pipe International Economic & Trading Corp.

Kelly, Judge:  This consolidated action comes before the court on USCIT Rule 56.2 motions for judgment on the agency record challenging the U.S. Department of Commerce's ("Department" or "Commerce") determination in the countervailing duty investigation of certain oil country tubular goods ("OCTG") from the People's Republic of China.  See Certain Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg. 64,045 (Dep't Commerce Dec. 7, 2009) (final affirmative countervailing duty determination, final negative critical circumstances determination) ("Final Results"), as amended, 75 Fed. Reg. 3,203 (Dep't Commerce Jan. 20, 2010) (amended final affirmative countervailing duty determination and countervailing duty order) ("Amended Final Results"); see also Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Oil Country Tubular Goods ("OCTG") from the People's Republic of China, C-570-944, (Nov. 23, 2009), available at

http://ia.ita.doc.gov/frn/summary/prc/E9-28779-1.pdf (last visited June 3, 2016) ("Final

Decision Memo").

Plaintiffs TMK IPSCO, V&M Star L.P., Evraz Rocky Mountain Steel, Wheatland

Tube Corp., and United Steelworkers (collectively "TMK"), domestic producers of OCTG

and a union of OCTG workers, commenced this action pursuant to section 516A of the

Tariff Act of 1930, as amended, 19 U.S.C. § 1516a (2006).[1]  The court consolidated

TMK's action with actions filed by: (1) Tianjin Pipe (Group) Corp. ("TPCO") and Tianjin

Pipe International Economic & Trading Corp. (collectively "TPCO Group"), exporters of

OCTG; (2) Maverick Tube Corporation ("Maverick"), a domestic producer of OCTG; and

(3) United States Steel Corporation ("U.S. Steel"), also a domestic producer of OCTG.

See Order, Oct. 6, 2010, ECF No. 46.  TMK, TPCO Group, Maverick, U.S. Steel, and

Plaintiff-Intervenor Bureau of Fair Trade Imports & Exports, Ministry of Commerce,

People's Republic of China ("Bureau of Fair Trade") filed Rule 56.2 motions for judgment

on the agency record.  See Mem. in Supp. Mot. J. Agency R. of TMK IPSCO, V&M Star

L.P., Wheatland Tube Corp., Evraz Rocky Mountain Steel, and the United Steelworkers,

Oct. 6, 2010, ECF No. 55 ("TMK Mot."); Pls. Tianjin Pipe (Group) Corp.'s and Tianjin Pipe

International Economic and Trading Corp.'s Mem. P. & A. Supp. Mot. J. Agency R., Oct.

6, 2010, ECF No. 54; Mem. in Supp. Maverick Tube Corporation's 56.2 Mot. J. Agency

R., Oct. 7, 2010, ECF No. 71 ("Maverick Mot."); Mem. in Supp. Pl. United States Steel

Corporation's Mot. J. Agency R. Under Rule 56.2, Oct. 6, 2010, ECF No. 67 ("U.S. Steel

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

Mot."); Rule 56.2 Mot. J. Agency R. of Pl.-Intervenor Bureau of Fair Trade for Imports and

Exports, Ministry of Commerce, The People's Republic of China, Oct. 6, 2010, ECF No.

56.  Defendant thereafter filed a response to the Rule 56.2 motions for judgment on the

agency record filed by the above named parties.  See Def.'s Resp. Opp'n to Pls.,' Pl.-

Intervenors,' and Def.-Intervenors' Mots. J. Agency R., May 5, 2011, ECF No. 86 ("Def.

Resp.").   U.S. Steel also filed a supplemental brief and Defendant submitted a

supplemental response brief.[2]  See Opening Suppl. Br. Supp. Pl. United States Steel

Corporation's Mot. J. Agency R. Under Rule 56.2, Sept. 30, 2015, ECF No. 142 ("U.S.

Steel Suppl. Br."); Def.'s Suppl. Resp. Br. Pursuant to This Ct.'s July 2, 2015 Scheduling

Order, Dec. 17, 2015, ECF No. 145 ("Def. Suppl. Resp.").  TMK and U.S. Steel each filed

replies to Defendant's response to their motions for judgment on the agency record.  See

Reply Mem. Supp. Mot. J. Agency R. of TMK IPSCO, V&M Star L.P., Wheatland Tube

Corp., Evraz Rocky Mountain Steel, and the United Steelworkers, Feb. 16, 2016, ECF

---

[2] On June 16, 2011, the court stayed this action pending the final resolution by the U.S. Court of Appeals for the Federal Circuit of the appeal of GPX Int'l Tire Corp. et al. v. United States, Consol. Court No. 08-00285.  See Order, June 16, 2011, ECF No. 106.  On May 7, 2015, the court lifted the stay and directed the parties to submit a status report.  See Order, May, 7 2015, ECF No. 124.  On June 18, 2015, the parties filed a joint status report in which TPCO Group and Bureau of Fair Trade requested dismissal of their claims.  See Joint Status Report Pursuant to Ct.'s May 7, 2015 and June 7, 2015 Orders, June 18, 2015, ECF No. 128.  In the same document, TPCO Group indicated it wished to remain in the action as Defendant-Intervenors and Bureau of Fair Trade indicated it would no longer participate in the action in any capacity.  See id. at 2.  The parties also requested an opportunity to submit supplemental briefs limited to discussing the surviving issues that were raised in each party's opening brief.  See id. at 2–3.
    The court dismissed all claims of TPCO Group and Bureau of Fair Trade with TPCO Group remaining in the action as Defendant-Intervenors, and permitted the parties to submit supplemental briefs limited to the surviving issues in the case.  See Order, July 2, 2015, ECF No. 131; Order, July 2, 2015, ECF No. 132; Order, July 9, 2015, ECF No. 133.

No. 146; Reply Br. Supp. Pl. United States Steel Corp.'s Mot. J. Agency R. Under Rule
56.2, Feb. 16, 2016, ECF No. 147 ("U.S. Steel Reply").

## BACKGROUND

On April 28, 2009, in response to a petition filed by TMK, Maverick, U.S. Steel, and
other domestic companies (collectively "Petitioners"), Commerce initiated a
countervailing duty investigation of OCTG from the People's Republic of China for the
period of January 1, 2008 through December 31, 2008.  See Certain Oil Country Tubular
Goods from the People's Republic of China, 74 Fed. Reg. 20,678, 20,679–80 (Dep't
Commerce May 5, 2009) (initiation of countervailing duty investigation); see also Petitions
for the Imposition of Antidumping and Countervailing Duties: Certain Oil Country Tubular
Goods From the People's Republic of China, PD 3 (Apr. 8, 2009) ("Petition").[3]  Commerce
selected four Chinese producers and exporters of subject merchandise as mandatory
respondents: Jiangsu Changbao Steel Tube Co., Ltd. ("Changbao"), TPCO, Wuxi
Seamless Oil Pipe Co., Ltd. ("Wuxi"), and Zhejiang Jianli Enterprise Co., Ltd. ("Jianli").
See Respondent Selection Memorandum at 6, PD 69 (June 3, 2009).  Commerce issued
its final determination on November 23, 2009, see Final Results, 74 Fed. Reg. at 64,045,
which Commerce later amended to correct certain ministerial errors resulting in final net
countervailing duty rates of 12.46% for Changbao, 10.49% for TPCO, 14.95% for Wuxi,
and 15.78% for Jianli, from which Commerce calculated an all others rate of 13.41%.
Amended Final Results, 75 Fed. Reg. at 3,204–05.

---

[3] On May 12, 2010, Defendant submitted an index with a complete list of the confidential and
public documents comprising the administrative record, which can be found at ECF No. 40.  All
further references to the administrative record may be located in that index.

The parties in this action make the following challenges to Commerce's final determination: (i) TMK, Maverick, and U.S. Steel (collectively "Plaintiffs") challenge Commerce's decision to postpone its investigation of certain subsidies first alleged during the course of the investigation and its refusal to investigate alleged export restraints on steel rounds and billets;[4] (ii) TMK challenges Commerce's refusal to investigate alleged subsidies received by Changbao; (iii) Plaintiffs challenge Commerce's refusal to investigate subsidies prior to the date that China acceded to the World Trade Organization ("WTO"); (iv) Maverick and U.S. Steel contest Commerce's inclusion of certain benchmarks for steel rounds and billets; (v) Plaintiffs challenge Commerce's refusal to make a quality adjustment to the benchmarks for steel rounds and billets; (vi) U.S. Steel disputes Commerce's freight cost adjustments to the benchmark for steel rounds and billets; (vii) TMK and U.S. Steel argue that Commerce erroneously attributed subsidies received by Changbao and Changbao's subsidiary Jiangsu Changbao Precision Steel Tube Co., Ltd. ("Precision"); (viii) U.S. Steel argues that Commerce incorrectly attributed subsidies received by TPCO and four of TPCO's subsidiaries; (ix) U.S. Steel argues that Commerce failed to tie the provision of steel rounds and billets for less-than-adequate-remuneration ("LTAR") only to TPCO's sales of steel pipe; and (x) Maverick challenges Commerce's decision not to apply facts otherwise available with an

---

[4] In its Rule 56.2 motion, U.S. Steel additionally claims Commerce failed to countervail export restraints on coke. <u>See</u> U.S. Steel Mot. 42–46. However, U.S. Steel abandoned this argument in its supplemental brief because Commerce found export restraints on coke to be a countervailable subsidy in a subsequent administrative review. <u>See</u> U.S. Steel Suppl. Br. 20.

adverse inference ("AFA")[5] to Jianli's purchases of steel rounds and billets.  See TMK Mot. 12–40; Maverick Mot. 13–49; U.S. Steel Mot. 13–42, 46–65.

For the reasons set forth below, the court finds that Commerce failed to adequately explain its decision to use China's WTO accession date as a cut-off for identifying and measuring countervailable subsidies, failed to reasonably explain how the Maersk and Jianli freight rates included in the benchmark price for steel rounds and billets are both representative of what an importer would pay, erred in attributing subsidies received by Precision to the sales of Changbao's other subsidiaries and in attributing subsidies received by four of TPCO's subsidiaries to the sales of TPCO's other subsidiaries, and failed to make a determination regarding whether the provision of steel rounds and billets at LTAR to TPCO were tied to its sales of seamless steel pipe.  Additionally, the court grants Defendant's remand request for Commerce to recalculate its benchmark excluding the SBB East Asia pricing data.  The court sustains Commerce's decision in all other respects.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2006),[6] which grant the court authority to review actions contesting the final determination in a countervailing duty investigation.  The court will uphold Commerce's

---

[5] Although 19 U.S.C. § 1677e(a)–(b) and 19 C.F.R. § 351.308(a)–(c) (2009) each separately provide for the use of facts otherwise available and the subsequent application of adverse inferences to those facts, Commerce uses the shorthand term "adverse facts available" or "AFA" to refer to Commerce's use of such facts otherwise available with an adverse inference. See, e.g., Final Decision Memo at 3–6, 55–63, 125–126.

[6] Further citations to Title 28 of the U.S. Code are to the 2006 edition.

determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Commerce's Decision to Defer Investigation of Certain New Subsidy Allegations Until First Administrative Review

Plaintiffs argue that both the relevant statute and regulations preclude Commerce from deferring its investigation of new subsidy allegations timely raised during the investigation.  See TMK Mot. 12–17; Maverick Mot. 13–18; U.S. Steel Mot. 30–37. Defendant argues Commerce deferred its investigation in accordance with 19 U.S.C. § 1671a(b)(1) and 19 C.F.R. § 351.311(b) (2009).[7]  See Def. Resp. 76–83.  The court finds that Commerce's postponement of its investigation of new subsidies is in accordance with law and not an abuse of discretion.

If Commerce discovers a practice during the course of a countervailing duty proceeding which appears to be a countervailable subsidy that was not alleged in the petition, Commerce "shall include the practice, subsidy, or subsidy program in the proceeding."  19 U.S.C. § 1677d(1).  An interested party may submit new subsidy allegations during the course of the investigation no later than "40 days before the scheduled date of the preliminary determination."   19 C.F.R. § 351.301(d)(4)(i)(A). Commerce shall initiate an investigation where an interested party "alleges the elements necessary" along with "information reasonably available to the petitioner supporting those allegations."  19 U.S.C. § 1671a(b)(1).  Commerce investigates alleged subsidies meeting

---

[7] Further citations to Title 19 of the Code of Federal Regulations are to the 2009 edition.

such requirements "if [it] concludes that sufficient time remains before the scheduled date

for the final determination."   19 C.F.R. § 351.311(b).   Should Commerce find that

insufficient time remains, it "defer[s] consideration of the newly discovered practice,

subsidy, or subsidy program until a subsequent administrative review, if any."  19 C.F.R.

§ 351.311(c).

On July 30, 2009, Petitioners timely submitted new subsidy allegations.

Commerce initiated investigations into nine of the alleged subsidies. See Memorandum

Regarding New Subsidy Allegations at 3–12, PD 209 (Sept. 18, 2009) ("New Subsidy

Allegations Memo").   However, Commerce ultimately postponed its investigation of these

newly alleged subsidies until the first administrative review because "the number and

complexity of the newly alleged subsidies, and the short time the Department has to

complete its investigation makes it impossible to conduct a meaningful examination of the

subsidies validly alleged by petitioners."   Memorandum Regarding Status of New Subsidy

Allegations at 6, PD 260 (Oct. 21, 2009) ("Status of New Subsidy Allegations").

Commerce did not act contrary to law or abuse its discretion by postponing its

investigation into the new subsidy allegations because it reasonably determined that there

was insufficient time remaining to investigate the new subsidy allegations.  An interested

party may submit new subsidy allegations during the course of the investigation no later

than "40 days before the scheduled date of the preliminary determination."  19 C.F.R.

§ 351.301(d)(4)(i)(A).  The plain meaning of this regulatory provision imposes a burden

on the interested party to timely raise new subsidy allegations, but it does not require

Commerce to investigate all timely raised allegations.  This regulatory provision must be

read together with 19 C.F.R. § 351.311(b) which obligates Commerce to investigate

potentially countervailable subsidies first alleged during a proceeding if it "concludes that

sufficient time remains before the scheduled date for the final determination." 19 C.F.R.

§ 351.311(b).  Commerce has discretion under the regulation to determine whether

"sufficient time remains" in a proceeding to investigate new subsidy allegations.[8]  Id.

Thus, the question is whether Commerce abused its discretion in determining that

insufficient time remained in the proceeding to complete its investigation of the newly

alleged subsidies.  The court finds Commerce has not.

Commerce explained that the subsidy allegations cover complex subsidies

requiring a laborious and difficult investigation.  Status of New Subsidy Allegations at 5.

Commerce specifically determined that investigating the provision of land for LTAR is

complicated because it requires "investigat[ing] the pricing policies of the local

government providing the land-use rights."  Id.  Commerce added that even the more

straightforward alleged subsidy programs were provided by different levels of the PRC

government (e.g., national, regional, municipal), which would further add to the time

necessary to develop a proper investigative record.  Id.  Commerce cited numerous tasks

it would have had to complete in the short time remaining given that the deadline in the

---

[8] Plaintiffs argue that the regulatory deadline for new subsidy allegations stripped Commerce of its discretion if the allegations are timely made because the 40-day regulatory deadline ensures that Commerce is given sufficient time for its investigation.  TMK Mot. 13–14; Maverick Mot. 14–18; U.S. Steel Mot. 30–32. While the submission deadline for new subsidy allegations may have been intended to inform Commerce of potentially countervailable subsidies sufficiently early in the proceeding, Commerce's regulations do not specify how much time is sufficient to investigate such subsidies because "the time necessary to investigate a particular subsidy practice will vary from case to case."  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,342–43 (Dep't Commerce May 19, 1997).

countervailing duty proceeding had not been aligned with the antidumping duty proceeding.[9]   Id.   Commerce also relied on the fact the subsidies alleged had not previously been investigated.   Id. at 5–6.   Based on Commerce's workload in the investigation, the number of new subsidy allegations, the complexity of those allegations, and the limited time period in which to complete its investigation, the court cannot say that Commerce unreasonably determined it lacked sufficient time to investigate these new subsidies.[10]

---

[9] Section 1671d(a)(1) of Title 19 of the U.S. Code provides that petitioners may request that the final determination in a countervailing duty and antidumping duty investigation be due at the same time if the investigations are initiated simultaneously and involve the same class or kind of merchandise.   19 U.S.C. § 1671d(a)(1).   Because the statutory timeframe for completing a countervailing duty investigation is shorter than in an antidumping duty investigation, aligning the deadlines in parallel antidumping and countervailing duty investigations affects Commerce's timeframe to complete the countervailing duty investigation.   Commerce noted that because the petitioners opted not to align the parallel antidumping and countervailing duty investigations, the deadline in the countervailing duty investigation was November 23, 2009.   See Status of New Subsidy Allegations at 3–5.

Plaintiffs contest Commerce's reliance on Petitioners' decision not to align the antidumping and countervailing duty proceedings in deciding to postpone the investigation.   TMK Mot. 16–17; Maverick Mot. 18; U.S. Steel Mot. 34.   However, Commerce did not postpone its investigation because the proceedings were not aligned, but rather because they were too complex.   See Status of New Subsidy Allegations at 5.   Commerce merely noted the decision not to align had the consequence of giving Commerce a smaller window of time in which to complete its investigation.   See id.   At oral argument, TMK argued that Commerce penalized petitioners for choosing not to align the proceedings.   See Oral Arg., 00:09:07–00:14:15, May 4, 2016, ECF No. 151.   However, TMK has not offered any record evidence to substantiate this claim.

[10] In deciding to defer its investigation of these subsidies, Commerce in part relied upon previous court decisions in Bethlehem Steel Corp. v. United States, 25 CIT 307, 140 F. Supp. 2d 1354 (2001) and Royal Thai Gov't v. United States, 28 CIT 1218, 341 F. Supp. 2d 1315 (2004).   See Status of New Subsidy Allegations at 3–5.   Plaintiffs argue that Commerce's reliance upon Bethlehem Steel and Royal Thai Gov't is misplaced because, in both cases, Commerce deferred its investigation of untimely new subsidy allegations, while here petitioners raised new subsidy allegations in a timely manner.   TMK Mot. 16; Maverick Mot. 17–18; U.S. Steel Mot. 35–36. However, nothing in these cases suggests that Commerce does not retain discretion to postpone investigating timely raised new subsidy allegations.

Maverick argues that Commerce's acceptance of a significant amount of new factual information submitted by the respondents at the "eleventh hour" contradicts its position that it lacked time to complete its investigation.  Maverick Mot. 15.  Maverick suggests that Commerce was required to investigate the new subsidy allegations rather than accepting and reviewing the new factual information.  However, it is not appropriate for the court to substitute its judgment for the agency's regarding the allocation of resources here.  Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995).  Further, Commerce's acceptance of new factual information is not relevant to evaluating the reasonableness of Commerce's determination that it lacked sufficient time to investigate new subsidies given their novelty and complexity.[11]

TMK argues that Commerce acted contrary to its own practice by declining to investigate timely raised new subsidy allegations.  TMK Mot. 16.  TMK does not point to any case in which Commerce articulates such a practice, but instead asserts that it "can find no case in which the Department refused to investigate allegations that were timely under its regulations and that otherwise constituted proper subsidy allegations."  TMK Mot. 16.  Even if Commerce has such a practice, it may provide a reasonable explanation for departing from it.  See Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.

---

[11] Maverick cites to Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States, 33 CIT 1125, 1129, 637 F. Supp. 2d 1260, 1263–64 (2015), arguing that Commerce cannot base its decision to postpone investigating timely raised new subsidy allegations on workload concerns.  See Maverick Mot. 17–18.  However, the issue before the court in Zhejiang Native Produce involved the standard for limiting the number of respondents that are individually examined, not the "sufficient time remaining" standard under 19 C.F.R. § 351.311(c).  See Zhejiang Native Produce, 33 CIT at 1129, 637 F. Supp. 2d at 1263–64.

Ins. Co., 463 U.S. 29, 42 (1983)).   Commerce reasonably explained why there was insufficient time in this case to investigate the alleged subsidies even though the allegations were timely submitted.

## II.   Commerce's Refusal to Investigate Certain New Subsidy Allegations

While Commerce deferred its investigation of the subsidies discussed above, Commerce declined to investigate other new subsidy allegations.[12]   Plaintiffs argue that Commerce's refusal to investigate alleged export restraints on steel rounds and billets based on a heightened initiation standard is contrary to law and, alternatively, unsupported by substantial evidence.   See TMK Mot. 17–25; Maverick Mot. 19–23; U.S. Steel Mot. 37–42.   TMK also argues that Commerce's refusal to investigate land-use rights, a steel mill, and equipment allegedly provided to Changbao at LTAR is unsupported by substantial evidence and contrary to law.   See TMK Mot. 25–32. Commerce's refusal to investigate each of these alleged subsidies is supported by substantial evidence and in accordance with law.

### A.   Commerce's Refusal to Investigate Alleged Export Restraints on Steel Rounds and Billets

An investigation into a particular subsidy program is warranted if an interested party, using information reasonably available to it, sufficiently alleges that: (1) a

---

[12] Commerce declined to investigate the following new subsidy allegations: (1) alleged export restraints on steel rounds and billets, see New Subsidy Allegations Memo at 2–3; (2) Changbao's alleged receipt of land-use rights from the Government of China for LTAR, see id. at 6–7; and (3) Changbao's alleged receipt of a steel mill and equipment from a state owned enterprise, Changzhou Baosteel, at LTAR.  See id. at 12–13.

government or public authority has provided a financial contribution,[13] (2) to a specific

enterprise or industry,[14] and (3) a benefit is conferred upon the recipient of the financial

contribution.[15]   See 19 U.S.C. §§ 1671a(b)(1), 1677(5)–(5A).   Upon receipt of an

allegation, Commerce determines whether the petition alleges the necessary elements

and contains information supporting the allegations.   19 U.S.C. § 1671a(c)(1)(A).

Commerce applies the same standard to subsidies not raised in the petition that are

---

[13] The statute defines "financial contribution" as

    (i)  the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

    (ii)  foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

    (iii) providing goods or services, other than general infrastructure, or

    (iv) purchasing goods.

19 U.S.C. § 1677(5)(D).

[14] A subsidy is specific if it is conditioned upon export performance or upon preferring domestic goods over imported goods.  19 U.S.C. § 1677(5A)(B)–(C).  The statute further provides that a subsidy can be specific as a matter of law (de jure) or specific as a matter of fact (de facto).  19 U.S.C. § 1677(5A)(D).  A subsidy is specific as a matter of law if "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).  A subsidy is specific as a matter of fact if: (i) the number of actual recipient enterprises or industries is limited; (ii) the subsidy is predominantly used by a particular enterprise or industry; (iii) a large amount of the subsidy is disproportionately received by a particular enterprise or industry; or (iv) the subsidy is administered in a manner that indicates an enterprise or industry is favored over others.  See 19 U.S.C. § 1677(5A)(D)(iii).  A subsidy is also considered specific if it "is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy."  19 U.S.C. § 1677(5A)(D)(iv).

[15] In relevant part, the statute views the following as a "benefit conferred":

    (iv)    in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

19 U.S.C. § 1677(5)(E)(iv).  The statute further provides that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided." 19 U.S.C. § 1677(5)(E).

alleged for the first time during the course of an investigation.  See New Subsidy Allegations Memo at 2.

While export restraints are not financial contributions that directly provide goods or services at LTAR, such restraints may function in a manner that indirectly confers a benefit on producers.  Commerce may countervail export restraints in these circumstances.[16]  See 19 U.S.C. § 1677(5)(B)(iii), (5)(D)(iii), (5)(E)(iv); see also 19 U.S.C. § 1671(a).  Commerce has developed a practice of requiring petitioners to demonstrate a long-term correlation by presenting historical data before initiating an investigation into export restraints that allegedly constitute countervailable subsidies.  See, e.g., Leather From Argentina, 55 Fed. Reg. 40,212, 40,213–14 (Dep't Commerce Oct. 2, 1990) (final affirmative countervailing duty determination and countervailing duty order);[17] Certain Softwood Lumber Products from Canada, 57 Fed. Reg. 22,570, 22,604–605 (Dep't Commerce May 28, 1992) (final affirmative duty determination); Certain Hot-Rolled Carbon Steel Flat Products From Argentina, India, Indonesia, South Africa, and Thailand, 65 Fed. Reg. 77,580, 77,584 (Dep't Commerce Dec. 12, 2000) (notice of initiation of

---

[16] The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act acknowledged Commerce's past treatment of export restraints and did not reject Commerce's view that 19 U.S.C. § 1677(5)(B)(iii) encompasses indirect subsidies such as export restraints so long as the standard under that statutory provision has been met.  SAA, H.R. Doc. No. 103-316, vol. 1, at 925–26, reprinted in 1994 U.S.C.C.A.N. 4040, 4239–40.

[17] In Leather From Argentina Commerce "held petitioners to an extremely high standard of proof" in alleging that an Argentine cattle hide embargo was a countervailable subsidy, requiring petitioners "to substantiate their claim that the embargo had a direct and discernible effect on hide prices in Argentina."  Leather From Argentina, 55 Fed. Reg. 40,212, 40,213 (Dep't Commerce Oct. 2, 1990) (final affirmative countervailing duty determination and countervailing duty order). Commerce found "[t]he historical comparison of the U.S. and Argentine hide price data for the period 1962 to 1989 shows a clear link between the imposition of the 1972 embargo and a divergence between U.S. and Argentine hide prices."  Id.

countervailing duty investigations); <u>Coated Free Sheet Paper from Indonesia</u>, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) (final affirmative countervailing duty determination).

Petitioners alleged that the Government of China's ("GOC") tax increase on exports of steel billets, including steel rounds, from fifteen percent to twenty-five percent, effective January 1, 2008, had the effect of substantially increasing the domestic supply of steel rounds in the first two months of 2008.  Country-wide New Subsidy Allegations for the Provision of Steel Rounds for Less Than Adequate Remuneration at 2–6, PD 130 (July 30, 2009) ("Petitioners' New Subsidy Allegations").   In an effort to establish a correlation between the export tax increase and the price decrease, Petitioners observed that from 2006 to approximately March 2008 "[s]teel billets exports fell 92.6 percent on an annual basis in the first two months of the year and were zero in the month of February." <u>Id.</u> at 3.  Petitioners additionally noted that, as a result of the dramatic decrease in exports, "world steel prices rose by 38.1 percent year on year to 221.9 points, compared with an increase in China's domestic price index of 29.61 percent to 142.31 points."  <u>Id.</u> at 3–4. Petitioners therefore claimed that Chinese producers received a subsidy because the export tax had the effect of causing Chinese steel prices to increase at a slower pace than the price increase for steel prices worldwide.

Commerce declined to investigate the alleged export restraints because the information does not show a sufficient relationship between the price difference and the export restraints.  Final Decision Memo at 113.  Specifically, Commerce referenced its practice in prior cases that it requires "long-term historical price comparisons that

demonstrate[ ] a clear link between the imposition of the [restraint] and the divergence of prices" to investigate subsidy allegations arising from export restraint programs.  <u>Id.</u>

Commerce's determination not to investigate the Petitioners' export restraint allegations is reasonable.  Commerce's practice required Petitioners to support their allegation of an indirect subsidy with long term historical pricing data, and Petitioners provided less than two years of data.  Final Decision Memo at 113 (citing <u>Leather From Argentina</u>, 55 Fed. Reg. 40,212).  "[I]n the case of an indirect subsidy, evidence of a causal nexus between the program and the benefit is also required."  <u>AK Steel Corp. v. United States</u>, 192 F.3d 1367, 1372 (Fed. Cir. 1999).  Petitioners were unable to offer the sort of long-term historical data that Commerce requires to sufficiently allege such a causal relationship.  <u>See</u> Petitioners' New Subsidy Allegations at 3–4.  Thus, Commerce reasonably determined that Petitioners' export restraint allegation failed to allege the necessary elements for the imposition of countervailing duties.[18]

U.S. Steel argues that "since the export restraints in question had only been in place since January 1, 2007, it is difficult to imagine how additional historical pricing information would have been at all relevant to the Department's analysis."  U.S. Steel Mot. 40–41.  Maverick echoes this argument, claiming that "domestic steel round and billet pricing in China was not consistently available prior to 2006."  Maverick Mot. 22.

---

[18] In its supplemental brief, U.S. Steel argues that the court recently confirmed that "'[t]he bar for launching a [countervailing duty] inquiry is low.'"  <u>See</u> U.S. Steel Suppl. Br. 16 (quoting <u>RZBC Grp. Shareholding Co. v. United States</u>, 39 CIT __, 100 F. Supp. 3d 1288, 1292 (2015)).  However, that case did not involve an allegation of indirect subsidies, such as an export tax, where it is Commerce's practice to hold petitioners to a higher standard of proof before initiating an investigation.  <u>See, e.g.</u>, <u>Leather From Argentina</u>, 55 Fed. Reg. at 40,213–14.

Commerce is not obligated to initiate an investigation based on speculative allegations, and U.S. Steel and Maverick point to nothing in the statute limiting Commerce's discretion to set a reasonable threshold for demonstrating a causal relationship between an export restraint program and pricing trends.   Commerce is required to "examine the accuracy and adequacy of the evidence provided in the petition," 19 U.S.C. § 1671a(c)(1)(A), and establishing a causal nexus reasonably follows from that statutory mandate for indirect subsidy allegations.    Notwithstanding the difficulty in obtaining supporting evidence, Commerce's practice required Petitioners to sufficiently allege that the export tax functioned as a countervailable subsidy and to make some threshold showing of a causal relationship.    Commerce found Petitioners failed to do so and reasonably declined to investigate the export restraints allegation.

### B.     Commerce's Refusal to Investigate Land-Use Rights Allegedly Provided to Changbao for LTAR

TMK argues that Commerce's refusal to investigate land-use rights allegedly provided to Changbao by the GOC at LTAR is unsupported by substantial evidence and contrary to law.  See TMK Mot. 25–29.  Defendant disagrees because Commerce found TMK failed to allege that the land-use rights provided to Changbao were specific.  See Def. Resp. 98–101.

A subsidy is considered specific, among other reasons, if it "is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy," or it is administered in a manner that indicates   an   enterprise   or   industry   is   favored   over   others.   19   U.S.C.

§ 1677(5A)(D)(iii)(IV)–(iv).   TMK alleged during the course of the investigation that Changbao received land-use rights from the GOC for LTAR.   See New Subsidies Allegations on Behalf of TMK IPSCO, V&M Star L.P., Wheatland Tube Corp., Evraz Rocky Mountain Steel, and the United Steelworks in the Countervailing Duty Investigation of Certain Oil Country Tubular Goods From the People's Republic of China at 14, CD 31 (July 30, 2009) ("TMK New Subsidy Allegations re: Changbao").   In support of its allegation, TMK submitted information to show that Changzhou Baogang Steel Pipe Co., Ltd. ("Changzhou Baosteel"), the state owned enterprise ("SOE") predecessor of Changbao, was given rights to land designated for industrial use by the Changzhou municipal government in Jiangsu Province.   TMK New Subsidy Allegations re: Changbao at 14, Attachs. 11, 13.

Commerce reasonably refused to investigate the provision of land-use rights to Changbao for LTAR because TMK failed to allege that the program was specific.   See Final Decision Memo at 124.   TMK argued that, according to 19 U.S.C. § 1677(5A)(D)(iv), the land-use rights are specific to Changbao because it received the rights as a result of being located in the jurisdiction of the granting authority, the Changzhou municipal government.   TMK New Subsidy Allegations re: Changbao at 15.   After examining TMK's allegation, Commerce found that TMK's allegation only included information pertaining to the location of one of Changbao's subsidiaries and failed to show that Changbao is located within the jurisdiction of the Changzhou municipal government.   See Final Decision Memo at 124; see also New Subsidy Allegations at 7.

TMK also argued the land-use rights provided to Changbao are specific according to 19 U.S.C. § 1677(5A)(D)(iii)(IV) because the rights were valued at 63,542,750 renmimbi by the government, but Changbao paid less than 3% of the value for such rights. TMK New Subsidy Allegations re: Changbao at 15.  TMK submitted information showing that Changbao allegedly received land-use rights at less than the appraised value, however, TMK did not submit information to show that the government favored Changbao over other enterprises or industries in providing those land-use rights.   Commerce reasonably found this allegation to be purely speculative because TMK failed to offer any support.   See Final Decision Memo at 124; New Subsidy Allegations Memo at 7. Commerce's determination not to investigate these subsidy allegations is reasonable because TMK failed to allege specificity.

**C.    Commerce's Refusal to Investigate a Steel Mill and Equipment Allegedly Provided to Changbao for LTAR**

TMK argues that Commerce's refusal to investigate the alleged provision of a steel mill and equipment to Changbao by the GOC for LTAR is unsupported by substantial evidence and contrary to law.  See TMK Mot. 29–32. In response, Defendant argues that Commerce correctly refused to investigate the alleged subsidy because TMK failed to sufficiently allege with supporting evidence that a benefit had been conferred upon Changbao.  See Def. Resp. 96–98.  The court agrees with Defendant.

TMK alleged during the course of the investigation that Changbao received a steel mill and equipment from the GOC for LTAR.   See TMK New Subsidy Allegations re: Changbao at 6–7.  To show that the GOC made a financial contribution that conferred a

benefit upon Changbao, TMK alleged that Changzhou Baosteel obtained the mill and equipment when [[                                                    ]] sold all its shares in Changzhou Baosteel to [[                                    ]] who then organized Changbao as a private company.  See id. at 6 (citing Questionnaire Response of Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu Changbao Precision Steel Tube Co., Ltd. at 4, CD 22 (July 22, 2009) ("Changbao Questionnaire Response")).  TMK alleged that Changbao effectively received the steel mill and equipment at LTAR because "Changbao has provided no evidence that any price was paid for its predecessor's assets" when Changbao was privatized.  Id. at 7.  After examining TMK's allegation, Commerce found it insufficient on a prima facie basis.  New Subsidy Allegations Memo at 13.

Commerce found that simply alleging privatization was insufficient to show that a benefit was conferred upon Changbao.  See New Subsidy Allegations Memo at 13; Final Decision Memo at 124.   Commerce found that neither Changbao's questionnaire response regarding the company's history nor any other record evidence supports that Changbao did not pay for the mill and equipment.  See Final Decision Memo at 124.  TMK submitted no other information supporting its allegation.   Therefore, Commerce reasonably determined that TMK's allegation was purely speculative and insufficient to initiate an investigation.

**III.  Commerce's Refusal to Identify and Measure Subsidies Prior to the Date China Acceded to the WTO**

Plaintiffs challenge Commerce's determination to uniformly apply the date of China's accession to the WTO, i.e., December 11, 2001, as the earliest date it could

identify and measure subsidies by the Chinese government in this countervailing duty investigation as contrary to law.  <u>See</u> TMK Mot. 33–36; U.S. Steel Mot. 26–30; Maverick Mot. 34–42.  Defendant argues that Commerce's application of this uniform cut-off date is a reasonable exercise of its discretion to allocate investigative resources.  <u>See</u> Def. Resp. 45–49.  Commerce has failed to reasonably explain its adoption of a uniform cut-off date for the identification and measurement of subsidies.

Commerce arbitrarily picked China's accession to the WTO as the date when economic conditions in China made subsidies identifiable and measurable.  The statute requires that Commerce impose countervailing duties on merchandise from an NME country if subsidies can be identified and measured.[19]  <u>See</u> 19 U.S.C. § 1671(f)(1)–(2) (2012).[20]  Here, Commerce found that reforms in the years leading up to China's WTO accession brought changes in the Chinese economy that permit it to identify and measure countervailable subsidies.  Final Decision Memo at 52.  Yet, Commerce articulates no relationship between China's WTO accession date and China's implementation of such reforms.  In fact, Commerce acknowledged there "was not a single moment or single

---

[19] When allocating the benefit for nonrecurring subsidies, Commerce normally allocates the benefit "to a firm over the number of years corresponding to the average useful life ("AUL") of renewable physical assets."  19 C.F.R. § 351.524(b)(1).  Commerce determined the AUL for the production assets for subject merchandise is 15 years.  Final Decision Memo at 6.  Therefore, by selecting December 11, 2001 as a cut-off date for identifying and measuring subsidies, Commerce may be failing to allocate subsidies attributable to years of the AUL of production assets prior to the cut-off date.

[20] Although this countervailing duty investigation was initiated on April 28, 2009, the 2012 version of 19 U.S.C. § 1671(f) applies here because the March 13, 2012 amendment applies to all countervailing duty proceedings initiated on or after November 20, 2006 and all civil actions relating to such proceedings.  <u>See</u> 19 U.S.C. § 1671 note (2012) (Effective and Applicability Provisions 2012 Acts).

reform law that suddenly permitted [it] to find countervailable subsidies" in the Chinese economy.  Id. at 53.  Commerce also acknowledged the reform process "may take hold in some sectors of the economy or areas of the country before others."[21]  Id. at 54.  None of the reforms Commerce identified occurred on the date of China's accession to the WTO.

Commerce has not explained why China's accession date was the first date where subsidies were identifiable and measurable, although the statute requires Commerce to countervail subsidies when they can be identified and measured.  See 19 U.S.C. § 1671(f)(1)–(2) (2012).  Therefore, on remand Commerce must investigate each subsidy program and allocate subsidies beginning on the first date it could identify and measure the subsidy considering the particular program in question and the impact of relevant economic reforms on that program.  Administrative burden alone does not excuse Commerce of this statutory responsibility.

Defendant argues Commerce chose China's WTO accession date because it corresponds to the time the most significant Chinese economic reforms occurred.  Def.

---

[21] Commerce recognized that China's reform process was uneven because it noted certain reforms, such as the elimination of price controls, had been in place for decades, while other areas continue to exhibit non-market characteristics today.  Final Decision Memo at 54 (citing Countervailing Duty Investigation of Coated Free Sheet Paper from People's Republic of China – Whether the Analytical elements of the *Georgetown Steel* Opinion are Applicable to China's Present Day Economy at 3, C-570-907, (Mar. 29, 2007), available at http://ia.ita.doc.gov/download/nme-sep-rates/prc-cfsp/china-cfs-georgetown-applicability.pdf last visited June 4, 2016) ("Georgetown Steel Memo")).  Commerce cited its Georgetown Steel Memo, which found subsidies identifiable and measureable, recognizing five major categories of reforms but also that certain indirect government controls over aspects of the economy remained in place despite these reforms.  Georgetown Steel Memo at 5–8.  Therefore, Commerce implied that a full range of market reforms is not a necessary precondition to the identification and measurement of subsidies.

Resp. 48.  However, Commerce identifies no specific economic reforms that occurred on that date.  The only fact Commerce mentions that relates to China's accession date is that China's WTO Accession Protocol contemplates application of the countervailing duty law.  Final Decision Memo at 52.  Commerce's analysis indicates the reforms themselves, not China's recognition that countervailing duty law applies to it, controls when Commerce can identify and measure subsidies.[22]  See id.  Commerce also recognized that many reforms, including the elimination of price controls on most products, were in place before China's accession to the WTO.  Id. at 54.  Therefore, Commerce has not explained why China's WTO accession date was the first date it could identify and measure subsidies in the Chinese economy.

IV.    **Benchmark Calculation for Steel Rounds and Billets**

A.    **Inclusion of London Metal Exchange Benchmark Data**

U.S. Steel and Maverick challenge Commerce's determination to include the London Metal Exchange ("LME") Far East and Mediterranean benchmark data in its benchmark calculation.  U.S. Steel Mot. 57–60; Maverick Mot. 32–34.  Defendant counters that Commerce properly included the LME benchmarks in its benchmark calculations for steel rounds because there is no record evidence to support the notion

---

[22] Defendant argues that China's recognition in the Accession Protocol that assumed obligations with respect to subsidies supports "'the notion the PRC economy had reached the stage where subsidies and disciplines on subsidies'" were identifiable and measurable.  Def. Resp. 47 (quoting Final Decision Memo at 53).  Even if it were true that China's recognition of the Accession Protocol signified it felt countervailing duty law could apply to it, it would not mean that China's accession date was the first date when Commerce could identify and measure Chinese subsidies.

that all reported steel round purchases were of OCTG-grade steel rounds.  Def. Resp.

118.  The court sustains Commerce's determination.

Where goods are provided for LTAR, a benefit shall normally be treated as

conferred upon the recipient.   19 U.S.C. § 1677(5)(E).   If actual market prices are

unavailable, Commerce will measure remuneration against "a world market price where

it is reasonable to conclude that such price would be available to purchasers in the country

in question," i.e., a tier two benchmark price.[23]  19 C.F.R. § 351.511(a)(2)(ii).  Commerce

averages prices where there is more than one commercially available world market price,

"making due allowance for factors affecting comparability."  Id.

Commerce included the LME benchmarks on the record in its benchmark

calculation for steel rounds and billet.  Final Decision Memo at 77.  Commerce reasoned

that it asked respondents to report purchases of all "steel rounds (e.g., billets, blooms)

because petitioners alleged the terms "billets" and "rounds" were used interchangeably.

Final Decision Memo at 77.  Commerce included the LME benchmark because it included

all purchases in its LTAR calculation.  Id.  Commerce's regulation requires that it average

all world benchmark data on the record to measure the adequacy of remuneration.  See

---

[23] Commerce measures the adequacy of remuneration using: (1) market prices for the good from actual transactions in the subject country; (2) a world market price for the good that is commercially available to purchasers in the subject country; or (3) government-set prices that are consistent with market principles.  19 C.F.R. § 351.511(a)(2).  Because Commerce prefers actual market-determined prices as an appropriate benchmark price from these options, Commerce refers to market-determined prices as "tier one" benchmarks and each option further removed from an actual market price as a numbered "tier," corresponding to Commerce's level of preference, as a shorthand.  See, e.g., Final Decision Memo at 13–14.  Thus, a world market price where no actual market-determined price is available to purchasers is also referred to as a "tier two" benchmark.

19 C.F.R. § 351.511(a)(2)(ii).   Neither U.S. Steel nor Maverick argue that the LME

benchmark pricing is not commercially available to producers in China.   Although

Commerce's regulation requires it to make allowance for factors affecting comparability

in its benchmark calculation, see id., U.S. Steel and Maverick cite no authority requiring

Commerce to exclude a commercially available benchmark price to measure the

adequacy of remuneration for respondents' purchases of steel inputs.

U.S. Steel and Maverick argue that Commerce erred in including the LME

benchmarks in its average calculation because record evidence shows that LME data

reflects standard commodity grade steel billets, which are not generally used to produce

OCTG.[24]   U.S. Steel Br. 58; Maverick Br. 32.   Commerce noted that it requested that

respondents report purchases other than rounds used to produce OCTG "based on

---

[24] Maverick also argues that Commerce must exclude the LME benchmarks from its benchmark calculations because it includes Chinese billet pricing, which distorts the benchmark and benefit analysis because the benchmark used to measure the benefit includes subsidized Chinese billet prices.   Maverick Mot. 33 (citing Maverick Submission of New Relevant Information at Attach. Petitioners' Surrogate Value Submission at Tab R at Attach. "LME Steel Billet Futures Brand Registration", PD 236 (Oct. 9, 2009) ("Maverick New Relevant Information")).   Defendant counters that Maverick failed to raise this argument before Commerce in the underlying proceeding.   Def. Resp. 119.   "[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."   28 U.S.C. § 2637(d).   If a party fails to exhaust available administrative remedies before the agency, "judicial review of Commerce's actions is inappropriate."   See Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003). Despite the fact that Commerce only elected to include LME pricing in its benchmark calculation in its final results, Maverick was on notice that Commerce was considering including LME pricing well before Commerce issued its final determination.   Maverick submitted this information on October 9, 2009, well before it submitted its case brief on November 11, 2009 challenging the inclusion of LME benchmark data.   See Maverick New Relevant Information; Maverick Case Brief, PD 289 (Nov. 9, 2009).   Maverick also challenged the inclusion of LME benchmarks in its rebuttal brief on the grounds that the data lacks comparability in terms of quality and is distortive because it includes only data for the second half of the period of investigation.   See Maverick Rebuttal Brief at 32–34, PD 309 (Nov. 16, 2009).   However, Maverick did not raise this objection.   Id.   Therefore, the court does not address Maverick's argument.

petitioners' allegations that interchanged the terms 'billets' and 'rounds.'"  Final Decision

Memo at 77.

U.S. Steel's argument to exclude benchmark pricing that includes standard steel

billets depends upon the assumption that respondents purchased only OCTG-grade steel

rounds.  If respondents used steel inputs that are included in the LME pricing data, then

Commerce's regulations require that it average all prices that are commercially available

in the producing country.  See 19 C.F.R. § 351.511(a)(2)(ii).  None of the respondents'

questionnaire responses indicate that they produced solely OCTG.  See TPCO Response

to the Department of Commerce's CVD Questionnaire at 8–9, PD 111 (July 21, 2009)

(reporting TPCO produces mainly petroleum casing pipe, oil tubing, line pipes, boiler

pipes, and mechanical pipes); Wuxi Seamless Oil Pipe Co. Ltd. CVD Questionnaire

Response at 7, PD 112 (July 20, 2009) (reporting Wuxi primarily produces OCTG and

drill pipe, but also produces line pipe, tubes for perforating guns, plain-end pipes, heat

insulated tubings, seamless pressure pipes used in high-pressure boiler, and other pipe

products while an affiliate sells green pipe, high pressure boiler pipe, and drill pipe); Jianli

Group's Initial CVD Questionnaire Response at 25–26, PD 112 (July 21, 2009) (reporting

Jianli's billet purchases for production of OCTG and bearing tube).  Although U.S. Steel

asserts that the questionnaire responses indicate all respondents primarily produce

seamless-pipe products, U.S. Steel cites no record evidence that the seamless-pipe

products respondents reported producing require only OCTG-quality rounds or that the

products included in the LME benchmarks cannot be used to make such products.[25] Neither U.S. Steel nor Maverick cite any record evidence that made it unreasonable for Commerce to conclude that respondents purchased products other than OCTG-quality billets.

U.S. Steel also argues that Commerce's justification for including the LME benchmarks data fails to justify its determination to include benchmarks reflecting standard commodity billets because the only non-OCTG quality rounds reported by respondents were seamless pipe quality rounds.  U.S. Steel Mot. 59.  Although U.S. Steel correctly notes that the record does not contain evidence that respondents reported steel rounds not used for seamless price production, id., U.S. Steel points to no record evidence detracting from the notion that the steel billets included in the LME benchmark pricing could be used in seamless pipe production.[26]

---

[25] U.S. Steel cites evidence that only premium-grade rounds are typically used for OCTG production, that producing subject merchandise from square commodity-grade billets may be cost prohibitive, and that OCTG-quality billets demand a significant price premium.  See, e.g., Maverick New Factual Information at Attachs. "Roland Balkenende Affidavit", "Petitioners' Surrogate Value Submission" at Tab R.  It is uncontested that respondents reported producing products other than OCTG and reported all purchases of billets and rounds for all those products.  See Memo to File re: Changbao Steel Round Suppliers, PD 178 (Aug. 28, 2009); Wuxi Seamless Oil Pipe Co., Ltd. Revised Appendix 5 for Billets at 2, PD 181 (Aug. 31, 2009); Memo to File re: Steel Round Suppliers for Tianjin Pipe (Group) Corporation, Tianjin Pipe Iron Manufacturing Co., Ltd., Tianguan Yuantong Pipe Product Co., Ltd., Tianjin Pipe International Economic and Trading Co., Ltd., and TPCO Charging Development Co., Ltd. (collectively "TPCO"), PD 186 (Sept. 2, 2009); Jianli Group First Supplemental Questionnaire Response at 10, PD 161 (Aug. 21, 2009). Respondents cite no record information that non-OCTG seamless products require OCTG-quality billets.

[26] U.S. Steel argues Jianli separately identified its steel round purchases, which included purchases used for OCTG production and for bearing tube.  U.S. Steel Mot. 52–53 (citing Jianli Group First Supplemental Questionnaire Response at 10, Ex. S-11, PD 161 (Aug. 21, 2009)).

(footnote continued)

U.S. Steel also argues Commerce erred in using the LME benchmark data because the LME data reflects only prices for square steel billets used to produce concrete reinforcing bar ("rebar"), which is not used in the production of OCTG. U.S. Steel Mot. 58 (citing TPCO Submission of New Factual Information at Attach. 2 at 5, 8); U.S. Steel Suppl. Br. at 23. U.S. Steel supports its argument that LME prices are for rebar citing statements in the LME publication that LME prices are for "the most commonly traded grade" of steel billet material and that there is a "high level of price correlation" between LME prices and rebar prices. U.S. Steel Mot. 58 (citing TPCO Submission of New Factual Information at Attach. 2 at 5, 8). However, it does not follow from either statement that LME pricing only reflects rebar prices.[27]

### B.    Inclusion of SBB "East Asia" Benchmark Data

U.S. Steel and Maverick also challenge Commerce's decision to include the Steel Business Briefing ("SBB") benchmark data on monthly export prices for billets from East Asia in its benchmark calculation for the provision of steel rounds and billets. See U.S. Steel Mot. 55–57; Maverick Mot. 30–32. Defendant requests remand for Commerce to

---

U.S. Steel further argues that billets used to produce seamless bearing tube are also not the type of commercial quality steel billets represented in the LME benchmark data. Id. at 53 (citing Maverick Submission of New Factual Information at "Petitioners' Surrogate Value Submission" at Tab R (stating that standard round commodity grade steel billets are not classified as seamless tube quality billets and are not subject to stricter quality requirements)). However, even if Jianli segregated its purchases, U.S. Steel cites no record evidence that the three other mandatory respondents did. U.S. Steel offers no authority indicating Commerce must exclude benchmark data that reflects merchandise commercially available from its calculation even if the data reflects some non-comparable pricing. See 19 C.F.R. § 351.511(a)(2)(ii).

[27] In fact, the document cited by U.S. Steel suggests a methodology for deriving a price for rebar using the LME steel billet price as a benchmark. TPCO Submission of New Factual Information at Attach. 2 at 8. If the LME data itself reflected rebar pricing, as U.S. Steel suggests, no adjustment to the LME benchmark price would be necessary to derive a price for rebar.

recalculate the benchmark without the SBB East Asia data.  <u>See</u> Def.'s Resp. 116.  The court grants Defendant's request for remand.

The court has discretion to grant a remand request when Commerce wishes to reconsider its previous position without confessing substantive error.  <u>See</u> <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  Generally, a request for a "remand due to substantial and legitimate agency concerns should be granted."  <u>Timken Co. v. United States</u>, 38 CIT __, __, Slip Op. 14-51, at *5 (May 2, 2014) (citing <u>SKF USA Inc.</u>, 254 F.3d at 1029).  Commerce has substantial and legitimate concerns if (1) there is a compelling justification for remand, (2) that justification is not outweighed by the need for finality, and (3) the scope of the requested remand is appropriate.  <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 37 CIT __, __, 882 F. Supp. 2d 1377, 1381 (2013).

Here, Defendant's request for remand satisfies the three-prong test, and Commerce's concerns are substantial and legitimate.  First, a remand request for Commerce to correct a potentially erroneous calculation of countervailing duty rates is a compelling justification.  <u>Cf.</u> <u>Baroque Timber Industries (Zhongshan) Co. v. United States</u>, 37 CIT __, __, 925 F. Supp. 2d 1332, 1339 (2013) (citing <u>Parkdale Int'l v. United States</u>, 475 F.3d 1375, 1380 (Fed. Cir. 2007)).  Second, the need for finality in this case does not outweigh the need to calculate accurate countervailing duty rates, particularly because Maverick and U.S. Steel seek remand on this very issue.  Moreover, no party objects to Defendant's request.  Third, the scope of Defendant's remand request is appropriate for the issue.  Accordingly, Defendant's remand request is based on a substantial and legitimate concern, and it is therefore granted.

C.      **Comparability Adjustment to the Benchmark Calculation**

Plaintiffs argue that Commerce was required to adjust the benchmark prices to reflect the higher value of OCTG-quality steel rounds used in the production of subject merchandise. See TMK Mot. 25; U.S. Steel Mot. 47–53; Maverick Mot. 24–29. Defendant responds that Commerce properly declined to make a premium quality adjustment because all purchases of steel rounds by producers were included in its benefit calculations, not just those for premium quality steel rounds. See Def. Resp. 120. Commerce's decision not to adjust the benchmark prices to reflect premium quality steel rounds is reasonable.

To determine whether a benefit is conferred, Commerce determines the adequacy of remuneration relative to prevailing market conditions for the good being provided in the country which is subject to the investigation. 19 U.S.C. § 1677(5)(E)(iv). "Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E). Commerce's regulations also provide that Commerce shall make allowance for factors affecting comparability in its benchmark calculation. 19 C.F.R. § 351.511(a)(2)(ii).

Commerce recognized that some steel products purchased by Chinese producers are OCTG-grade products, but it included all steel purchases in its benefit calculation because respondents reported all steel billet purchases regardless of the ultimate product they were used to produce. See Final Decision Memo at 78. Commerce found it would be inappropriate to adjust the benchmark to reflect only premium-quality steel purchases where Commerce must measure the adequacy of remuneration for all steel purchases,

not just OCTG-grade steel round purchases.  Id.  Although U.S. Steel and Maverick argue that all of the products respondents reported producing also require steel rounds of higher quality than those included in the benchmarks used here, no record evidence supports that assertion.  Therefore, Commerce reasonably concluded that it could not inflate all benchmark prices to reflect premium-quality products.

U.S. Steel and Maverick argue that the statute and the regulations require Commerce to adjust for premium quality rounds because seamless pipe quality rounds are premium steel products that are not similar or commercially interchangeable with the products included in the SBB or LME benchmarks, which reflect lower value commercial quality steel billets.  U.S. Steel Mot. 49–50; Maverick Mot. 32–33.  They further argue that Commerce's practice is to select benchmarks that are comparable in physical characteristics and that are commercially interchangeable with the government-provided input.  U.S. Steel Mot. 47; Maverick Mot. 23.  Nothing in the petition indicates that the GOC program provided only OCTG-quality steel rounds to Chinese producers.  The petition defined steel rounds for the production of OCTG broadly to include "round steel billets," "round billets," or simply "billets" without reference to any specific quality grades or physical or chemical properties.  See Petition at 23 n. 263.  Defendant does not contest that the benchmarks used by Commerce reflected products other than OCTG-quality billet.  However, neither U.S. Steel nor Maverick point to any record evidence that the GOC provided only OCTG-quality billet to producers of subject merchandise.  Therefore, Commerce reasonably declined to adjust the benchmark to reflect only premium-quality goods.

U.S. Steel and Maverick also argue that Commerce had no basis to conclude respondents reported steel rounds or billets that were not used to produce OCTG.  U.S. Steel Mot. 50; Maverick Mot. 28.  First, U.S. Steel and Maverick argue that, by instructing the companies to report "'steel rounds (e.g. billets, blooms) purchase[d] <u>for the production of the subject merchandise</u> during the POI'" in its questionnaire, Commerce only requested that respondents report OCTG-quality steel rounds.  U.S. Steel Mot. 50 (quoting Countervailing Duty Questionnaire at Section III at Question S, PD 72 (June 4, 2009) ("CVD Questionnaire")); Maverick Mot. 28 (citing CVD Questionnaire at Question S).  Commerce noted that it did not limit its request to respondents' purchases to OCTG-grade product because the allegation in the petition "interchanged the terms 'billets' and 'rounds.'"  Final Decision Memo at 77.  U.S. Steel and Maverick argue that the petition and Commerce's questionnaire were framed narrowly, but that interpretation is belied by the broad wording of the petition and by Maverick's specific request that Jianli report all purchases of steel rounds regardless of the product the rounds were being used to produce.  <u>See</u> Petition at 23 n. 263; Maverick Deficiency Comments Regarding Jianli's July 20, 2009 Countervailing Duty Questionnaire Responses at 20, PD 127 (July 30, 2009).   Respondents reported purchasing inputs for non-OCTG products.[28]   <u>See</u>

---

[28] Although U.S. Steel argues that Jianli reported its purchases of OCTG-grade rounds separately from those used to produce other merchandise, Commerce reasonably declined to adjust the benchmark because it had to measure the adequacy of remuneration of the entire program including the provision of steel rounds to OCTG producers, regardless of what products they were ultimately used to produce.  Even if the purchases designated for different products could be separated from those for OCTG, the petition alleged generally that inputs referred to as round steel billets, round billets and simply billets were provided to Chinese producers.  <u>See</u> Petition at 23 n. 263.

Changbao Steel Round Purchases (stating Changbao reported purchases of all steel rounds, not only those used in production of OCTG); Wuxi Revised Appendix 5 at 2 (stating Wuxi reported all billet purchases, not just those used for production of subject merchandise and that billet purchase information is not segregated based on finished product); TPCO Steel Round Purchases (stating TPCO reported purchases of all steel rounds, not only those used in production of OCTG); Jianli Group First Supplemental Questionnaire Response at 10, PD 161 (Aug. 21, 2009) (including Jianli's purchases for production of core rod and bearing tube purchases in addition to purchases used in the production of OCTG). Petitioners cannot have it both ways. Since they requested that Commerce frame the investigation of the benefit conferred broadly, Commerce had to measure the benefit conferred by the whole program, not just that conferred by the highest quality inputs.

Second, U.S. Steel and Maverick argue that Commerce had no basis to conclude that respondents reported purchasing a variety of steel billets. U.S. Steel Mot. 51; Maverick Mot. 28–29. U.S. Steel argues that information obtained at verification indicates respondents purchased high-quality rounds.[29] U.S. Steel Mot. 51–52. However, their argument is based on an assumption that all seamless steel products require premium quality steel rounds. Neither U.S. Steel nor Maverick point to any record evidence that all seamless tube products respondents reported producing require OCTG-grade steel

---

[29] Specifically, U.S. Steel argues that the Department confirmed at verification that [[

]]. U.S. Steel Mot. 51–52.

rounds or that the seamless pipe products produced by respondents require similar quality inputs to those used to produce OCTG.[30]

### D.    Ocean Freight Adjustments to the Benchmark Calculation

U.S. Steel challenges Commerce's freight adjustments to the benchmark calculation for steel rounds and billets to reflect delivery charges, including Commerce's decision to use a freight quote from Jianli's freight provider and its decision to exclude a special equipment surcharge from the Maersk freight rate.  See U.S. Steel Mot. 60–65. Defendant argues that U.S. Steel's arguments regarding the inclusion of Jianli's freight quote are "mere conjecture" and Commerce reasonably excluded the surcharge for using flat rack containers from the Maersk data because importers of steel rounds and billets would not necessarily pay such a charge to import steel rounds and billets.  See Def. Resp. 122–23.   Commerce's decision to exclude the special equipment surcharge is reasonable, but Commerce must reconsider or further explain its decision to use an average of the Jianli freight quote and the Maersk data to adjust the benchmark calculation for freight costs.

Commerce adjusts its world market benchmark price for ocean freight costs "to reflect the price that a firm actually paid or would pay if it imported the product."  19 C.F.R. § 351.511(a)(2)(iv).   Commerce's regulations neither require nor preclude Commerce from averaging freight costs when adjusting the world market benchmark for import costs.

---

[30] U.S. Steel and Maverick argue that Commerce unreasonably concluded that Jianli purchased non premium steel rounds because the only other products Jianli reported producing are bearing tubes, which also they assert require premium steel rounds.  U.S. Steel Mot. 52; Maverick Mot. 29.  However, the parties point to no record evidence that indicates bearing tubes require premium steel rounds.

19 C.F.R. § 351.511(a)(iv).  Therefore, Commerce has broad discretion in determining how to adjust the world market benchmark price to reflect freight costs incurred by purchasers so long as it does so reasonably.  Here, Commerce has not done so reasonably.  In the preliminary results, Commerce adjusted the benchmark price for steel rounds and billets to include ocean freight costs a company would incur to import products to China based on pricing data from the international shipping line Maersk.  See Prelim. Results, 74 Fed. Reg. at 47,219; see also U.S. Steel Pre-Preliminary Comments at Exs. 6–10, PD 164 (Aug. 25, 2009) ("U.S. Steel Pre-Prelim. Comments").  Jianli subsequently submitted a price quote from its freight forwarder for shipping steel rounds and billets to China.  See Jianli Group's Submission of Factual Information at Attachs. 1–2, PD 230 (Oct. 5, 2009) ("Jianli Freight Quote").  Commerce found that the two freight rates reflect what a company would have paid to import the merchandise and used an average of the Jianli freight quote and the Maersk data to adjust the benchmark for ocean freight costs. Final Decision Memo at 84–85.

Commerce included the Jianli freight quote and continued to use the Maersk data because it found both "reflective of what an importer would have paid to import steel rounds."  Final Decision Memo at 84.  Commerce rejected Jianli's argument to exclude the Maersk data, stating "so long as the ocean freight costs are reflective of market rates for ocean freight, and representative of the rates an importer – and not necessarily the respondent specifically – would have paid, then the prices are appropriate to include in our benchmark."  Id. at 85.  Implicit in Commerce's reasoning is that it is inappropriate to include unrepresentative data in the benchmark.  Commerce found both freight rates to

be representative because the record lacked information that would lead it "to question the accuracy of these submitted ocean freight rates." Id. at 84.  However, a simple comparison of the two quotes undermines the representativeness of one of them.

Both of the rates offered ocean freight costs for each month during the period of the investigation from the same origin locations, yet the two freight rates widely differ. During the period of investigation, the Jianli freight quote ranged from $290–$540 per container, see Jianli Freight Quote at Attach. 2, whereas the Maersk data ranged from $2,705.12–$3,821.96 per container.  See U.S. Steel Pre-Prelim. Comments at Ex. 1 at Figure 2.  This price comparison is based on the two rates without the adjustments Commerce had made in its final calculations, however, the price disparity remained significant even with those adjustments.  After Commerce's final adjustments,[31] the Jianli freight quote ranged from $510–$860 per container, see Jianli Freight Quote at Attach. 2, and the Maersk data ranged from $909.09–$2,197.62 per container during the period of investigation.  See id.  No matter how the two rates are compared, whether adjusted or unadjusted, there is a considerable price difference that calls into question the representativeness of the rates.  However, at no point did Commerce address this price

---

[31] For Jianli's freight quote, Commerce added fees for freight, terminal handling charge, handling charges, documentation, and custom clearance, which ranged from a total of $410–$510 per container.  See Final Decision Memo at 84–85; Calculations for the Final Determination for Zhejiang Jianli Company Limited ("Jianli"), Zhejiang Jianli Steel Tube Co., Ltd. ("Jianli Steel Tube"), Zhuji Jiansheng Machinery Co., Ltd. ("Jiansheng"), and Zhejiang Jianli Industry Group Co., Ltd. ("Jianli Industry") (collectively, the "Jianli Group") at Attach. 3, PD 311 (Nov. 23, 2009) ("Jianli Final Calculations").  For the Maersk data, Commerce excluded the "special equipment surcharge" after finding that a company would not necessarily incur such an expense to import the product, which was an additional cost that ranged from $1,000–$2,100 per container.  See Final Decision Memo at 85; Jianli Final Calculations at Attach. 3.

disparity.  Although Commerce bases its decision on the representativeness of both rates, it failed to explain how such different rates are each representative, and thus reflect the price a firm actually paid or would pay if it imported the product as required by 19 C.F.R. § 351.511(a)(iv).[32]  On remand, Commerce must explain how Jianli's freight quote and the Maersk data represent the costs a company would have paid to import the merchandise despite their significant price differences in order to continue using an average of both rates or reconsider its freight adjustment.

However, Commerce's decision to exclude the special equipment surcharge from the freight adjustment is reasonable.  Commerce excluded the flat rack charge because Jianli's freight provider's statement indicated that a company would not necessarily pay the flat rack charge to import steel rounds and billets.  Final Decision Memo at 85 (citing U.S. Steel Pre-Prelim. Comments at Exs. 5, 12; Jianli Freight Quote at Attach. 1 ¶5).  U.S. Steel submitted information stating that the "[c]ommodities commonly shipped in the flat rack container include machinery, industrial boilers, tractors, parts packed in cases, steel tubes, steel pipes, steel bars and cables" and that flat rack containers are "ideal for items such as heavy machinery pipes and boats."  U.S. Steel Pre-Prelim. Comments at Exs. 5, 12.  However, Commerce found the information submitted by U.S. Steel pertained to finished or high-quality steel products, not steel rounds and billets.  Final Decision Memo

---

[32] At oral argument, Defendant argued that the quote from Jianli's freight provider might simply be a bargain, see Oral Arg., 01:28:32–01:29:12, May 4, 2016, ECF No. 151, but that explanation suggests that the Jianli freight quote does not necessarily reflect what a company would have paid to import the merchandise.  That is not to say that the Jianli freight quote cannot be considered representative or that it is improper for Commerce to use an average of two ocean freight rates.  However, without further explanation the court cannot accept that two widely divergent quotes are both representative of what an importer would pay.

at 85.   U.S. Steel points to no record evidence detracting from this finding.   Thus, Commerce reasonably excluded the special equipment surcharge from the Maersk data because the record only contained information indicating that flat rack containers were not used to ship steel rounds and billets.

U.S. Steel contends that it is Commerce's practice to include all of the itemized shipping costs in the Maersk data in determining freight costs.   U.S. Steel Mot. 60 (citing U.S. Steel Pre-Prelim. Comments at Exs. 2–3).   Yet, U.S. Steel's argument fails to show that Commerce's practice is to use all of the costs reported by Maersk even in the face of record evidence that a company would not necessarily pay for one of the itemized costs in the Maersk rate.   Commerce reasonably used the Maersk data here only to the extent that those costs reflected costs to import steel rounds and billets.

U.S. Steel argues that Commerce's reliance on the freight quote and accompanying affidavit submitted by Jianli to exclude flat rack fee is inappropriate because, while Jianli's freight provider might not use flat rack containers to ship steel rounds and billets, other shippers would impose such a charge.   U.S. Steel Reply 19–20. However, Commerce found that the only pertinent evidence on the record regarding the use of flat rack containers to ship steel rounds and billets indicated that a shipper would not use them and thus a company would not pay a premium to ship such goods.   Final Decision Memo at 85.   U.S. Steel heavily relies upon its submissions which state that flat rack containers are used to ship "machinery, industrial boilers, tractors, parts packed in cases, steel tubes, steel pipes and cables," and that flat rack containers are "ideal for items such as heavy machinery pipes and boats."   U.S. Steel Pre-Prelim. Comments at

Exs. 5, 12.  However, Commerce found that this information discusses the use of flat rack

containers for finished or high-quality goods and is not reflective of costs to transport steel

rounds and billets.  Final Decision Memo at 85.  U.S. Steel is unable to point to any record

evidence that refutes Commerce's finding.  U.S. Steel asserts its information showed that

flat rack containers are used to ship heavyweight cargo and not only finished or high-

quality merchandise.  U.S. Steel Mot. 62.  Based upon the goods mentioned in the

information submitted by U.S. Steel, the court cannot say that it was unreasonable for

Commerce to infer that flat rack containers are used to ship finished or high-quality

merchandise.

U.S. Steel argues that Commerce lacked substantial evidence to exclude the flat

rack charge because "there is no evidence that Maersk Lines would ship steel rounds to

China by flat rack container without requiring customers to pay the special equipment

surcharge," U.S. Steel Mot. 62.  Commerce did not find that Chinese shippers did not

charge Chinese producers a premium to use flat rack containers, but rather that those

shippers did not necessarily use flat rack containers to ship steel rounds and billets to

China.  See Final Decision Memo at 85.  U.S. Steel cites to RZBC Grp. Shareholding Co.

v. United States, 39 CIT __, __–__, 100 F. Supp. 3d 1288, 1312–1313 (2015), where the

court affirmed the inclusion of Maersk's special equipment surcharge in calculating

shipping costs to China.  U.S. Steel Suppl. Br. 25.  However, the record in that case

contained no evidence that producers did not pay an equipment surcharge.  RZBC Grp.,

39 CIT at __, 100 F. Supp. 2d at 1312.  Here, Jianli submitted information from its freight

provider stating that it did not use flat rack containers to ship steel rounds and billets to

China.  In <u>RZBC Grp.</u>, the court did not hold Commerce must include a flat rack surcharge where no evidence in the record indicates producers paid such a charge.  <u>See</u> <u>id.</u> at __–__, 100 F. Supp. 2d at 1312–13.  Therefore, Commerce's decision to exclude the special equipment surcharge from the Maersk data is reasonable.

## V.  Attribution of Subsidies

TMK and U.S. Steel argue that Commerce incorrectly calculated the ad valorem subsidy rates for Changbao and TPCO.  <u>See</u> TMK Mot. 35–40; U.S. Steel Mot. 13–26; U.S. Steel Suppl. Br. 4–10.  Commerce's decision to allocate subsidies received by Changbao and TPCO to the sales of each of their subsidiaries in addition to their own sales is in accordance with law.  However, Commerce acted contrary to law in attributing the subsidies received by Precision to the sales of Changbao's other subsidiaries and attributing the subsidies received by four of TPCO's subsidiaries to the sales of TPCO's other subsidiaries.  Further, Commerce failed to reasonably explain its decision not to tie the provision of steel rounds and billets at LTAR only to TPCO's sales of seamless steel pipe.

### A.  Attribution of Subsidies Received by a Parent Company

TMK and U.S. Steel argue that Commerce incorrectly attributed the subsidies received by Changbao to the consolidated sales of Changbao and its subsidiaries without additionally investigating the subsidies received by Changbao's subsidiaries.  <u>See</u> TMK Mot. 35–36; U.S. Steel Mot. 24–26.  U.S. Steel additionally argues that Commerce made the same error in attributing the subsidies received by TPCO to its own sales as well as the sales of its subsidiaries.  <u>See</u> U.S. Steel Mot. 13–19.  Defendant responds that

Commerce's allocation of subsidies received by Changbao and TPCO is reasonable and in accordance with law.  See Def. Resp. 99–105.

In general, Commerce "calculate[s] an ad valorem subsidy rate by dividing the amount of the benefit allocated to the period of investigation . . . by the sales value during the same period of the product or products to which [Commerce] attributes the subsidy." 19 C.F.R. § 351.525(a).    Commerce ordinarily divides the subsidies received by a company only by the sales of that company, even if there is cross-ownership between corporations.[33]   See 19 C.F.R. § 351.525(b)(6)(i).   However, Commerce's regulations provide an exception to its default attribution rule if the company that receives a subsidy is a holding or parent company.  19 C.F.R. § 351.525(6)(b)(iii).  Where a holding or parent company receives a subsidy and does not merely serve as a conduit for transferring the subsidy to a subsidiary, Commerce attributes the subsidy not only to the holding or parent company's own sales, but also to the sales of its subsidiaries.

Commerce's decision to attribute the subsidies received by Changbao and TPCO to each of their sales as well as the sales of each of their subsidiaries is reasonable. Attributing subsidies received by a parent company to the sales of its subsidiaries is not conditioned upon the parent company reporting, or Commerce additionally investigating, subsidies received by its subsidiaries.  See 19 C.F.R. § 351.525(b)(6)(iii).  TMK and U.S.

---

[33] Commerce's regulations provide that "[c]ross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets."  19 C.F.R. § 351.525(6)(vi).

Steel point to no authority that supports its assertions that restrict the application of 19

C.F.R. § 351.525(b)(6)(iii) beyond the conditions expressed in the provision.

With respect to Changbao, Commerce learned at verification that Changbao's

reported sales reflected not only its own sales, but also the sales of all of its subsidiaries.

See Final Decision Memo at 8 (citing Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu

Changbao Precision Steel Tube Co., Ltd. Verification Report at 6, PD 268 (Oct. 29,

2009)).  Because Commerce found that Changbao is a parent company, Commerce

attributed the subsidies received by Changbao to the consolidated sales of Changbao

and its subsidiaries pursuant to 19 C.F.R. § 351.525(b)(6)(iii).  Id.  Likewise, TPCO's

reported sales included its own sales and the sales of all of its subsidiaries.  See id. at 9.

Commerce also found that TPCO is a parent company and attributed the subsidies

received by TPCO to the consolidated sales of TPCO and its subsidiaries.  See id. (citing

Certain Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg.

47,210, 47,215 (Dep't Commerce Sept. 15, 2009) (preliminary affirmative countervailing

duty determination, preliminary negative critical circumstances determination) ("Prelim.

Results")).  Because Commerce found that both Changbao and TPCO are parent

companies, Commerce reasonably attributed the subsidies received by Changbao and

TPCO to each of their own sales in addition to each of their subsidiaries' sales.

U.S. Steel argues that "it is essential that the universe of subsidies reported

matches the universe of sales that the subsidies benefit."  U.S. Steel Mot. 16 (citing

Allegheny Ludlum Corp. v. United States, 24 CIT 452, 473, 112 F. Supp. 2d 1141, 1160–

61 (2000)).  U.S. Steel's reliance on Allegheny Ludlum is of no avail because the sales of

a parent company and its subsidiaries benefit equally from a subsidy received by the parent company given the relationship between the companies.   See 19 C.F.R. § 351.525(b)(6)(iii).   Thus, the universe of subsidies matched the universe of sales because the subsidies received by Changbao and TPCO also benefitted the sales of each of their subsidiaries.   U.S. Steel further argues that 19 C.F.R. § 351.525(a) requires that "both the numerator (the benefit) and denominator (the universe of sales to which the benefit applies) used in . . . calculation of a subsidy" must reflect the same universe of goods.   U.S. Steel Suppl. Br. 4–5 (citing Samsung Elecs. Co. v. United States, 38 CIT __, __, 973 F. Supp. 2d 1321, 1324 (2014); Yama Ribbons & Bows Co. v. United States, 36 CIT __, __, 865 F. Supp. 2d 1294, 1298 (2012)).   However, 19 C.F.R. § 351.525(a) instructs Commerce to attribute subsidies in accordance with § 351.525(b), which Commerce has done here.

TMK argues that, by accepting Changbao's explanation at verification that its reported sales included its own sales as well as all of its subsidiaries, Commerce improperly accepted untimely new factual information.   See TMK Mot. 37–38.   In a countervailing duty investigation, submission of factual information "requested by the verifying officials . . . normally will be due no later than seven days after the date on which the verification of that person is completed."   19 C.F.R. § 351.301(b)(1).   Thus, Commerce's regulations anticipate the need for Commerce to obtain new factual

information before, during, or even after verification.[34]   TMK argues that Commerce is barred from obtaining new factual information at verification if such information is favorable to the respondent.  See TMK Mot. 38.  However, TMK does not offer any authority to support its position.  Therefore, Commerce did not err in attributing subsidies received by Changbao and TPCO.

### B.   Attribution of Subsidies Received by Certain Subsidiaries

TMK claims Commerce had no regulatory basis to attribute subsidies received by Precision, a subsidiary of Changbao, to the sales of Changbao's other subsidiaries.  See TMK Mot. 36–40.  U.S. Steel argues that Commerce erred in attributing the subsidies received by Precision as well as four of TPCO's subsidiaries because 19 C.F.R. § 351.525(b)(6)(iii) "allows subsidies received by a 'holding company' to be attributed to the consolidated sales of the 'holding company and its subsidiaries,' but it does not authorize the attribution to the entire corporate group of subsidies received by a *subsidiary*."  U.S. Steel Suppl. Br. 7–8.

### 1.  Waiver and Exhaustion

Defendant argues U.S. Steel waived its argument by failing to raise it in its opening brief, see Def. Suppl. Resp. 8, and invokes the exhaustion doctrine with respect to TMK's argument.  See Def. Resp. 105–06.

---

[34] Although obtaining new factual information is not the primary purpose of verification, Commerce has developed a practice of accepting new factual information at verification when "(1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record."  Citic Trading Co. v. United States, 27 CIT 356, 373 (2003) (citing previous determinations where Commerce has set forth circumstances where it accepts new factual information at verification).

U.S. Steel raised the argument relating to Commerce's method for attributing the subsidies received by Precision and TPCO's four subsidiaries in its opening brief. Generally, "arguments not raised in the opening brief are waived." SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) (citing Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1320–21 n.3 (Fed. Cir. 2005)). However, U.S. Steel argued in its opening brief that "Changbao reported only those subsidies that were received by it and one of its subsidiaries, Precision Steel . . . , therefore, the Department should have attributed the subsidies reported for Changbao Steel and Precision Steel to their combined unconsolidated sales, net of sales between the two companies." U.S. Steel Mot. 25.  U.S. Steel clearly argued that Commerce erred in attributing the subsidies received by Changbao and Precision to more than only the sales of the two companies investigated.  U.S. Steel's argument encompasses a challenge to Commerce's decision to attribute the subsidies received by Precision to the sales of Changbao's other subsidiaries.  U.S. Steel additionally argued that Commerce had no basis for attributing the subsidies received by four of TPCO's cross-owned affiliates to the consolidated sales of TPCO and all of its subsidiaries.  See U.S. Steel Mot. 16–19.  Thus, U.S. Steel did not fail to raise the argument in its opening brief and has not waived the argument.

As a separate matter, Defendant claims TMK has failed to exhaust its administrative remedies.  See Def. Resp. 105–06.  The Court "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The foundational principle of the exhaustion requirement is "that no one is entitled to judicial

relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003). At the administrative level, interested parties are afforded an opportunity to submit a case brief following the preliminary results to "present all argument that continue . . . to be relevant to [Commerce's] final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results." 19 C.F.R. § 351.309(c). The Court of Appeals for the Federal Circuit has consistently held that requiring exhaustion prior to judicial review is exercised with a measure of discretion by the court. See, e.g., Corus Staal BV v. United States, 502 F.3d 1370, 1381 (Fed. Cir. 2007); Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006); Consol. Bearings Co., 348 F.3d at 1003.

Before Commerce, TMK did not contest Commerce's application of the attribution rules in its case brief. See Domestic Interested Parties' Case Brief, PD 282 (Nov. 9, 2009). U.S. Steel, however, contested Commerce's application of the attribution rules with respect to subsidies received by subsidiaries in its case brief and, as discussed above, has not waived that argument before the court. The exhaustion requirement is imposed to "allow[] the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review–advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 88–90 (2006)). Courts have allowed litigants who have failed to raise an issue at the administrative level to argue the issue if it was raised before

the agency by another party because, in such situations, the concerns that are meant to be addressed by the exhaustion doctrine might not be implicated.  See, e.g., Kessler v. Surface Transp. Bd., 635 F.3d 1, 7–8 (D.C. Cir. 2011); Cellnet Commc'n, Inc. v. FCC, 965 F.2d 1106, 1109 (D.C. Cir. 2006).  Because U.S. Steel raised the argument before Commerce and the agency was given an opportunity to address the issue, it would be a meaningless exercise to enforce the exhaustion requirement under these circumstances. Having determined that U.S. Steel has not waived the argument and that requiring TMK to exhaust its administrative remedies does not serve the doctrine's purpose in this case, the court now turns to the merits of these arguments.

### 2.  Analysis

Generally, even in the case of cross-owned companies, Commerce's default rule is to "attribute a subsidy to the products produced by the corporation that received the subsidy."   19 C.F.R. § 351.525(b)(6)(i).   Commerce's regulations provide several exceptions to its default attribution rule.  See 19 C.F.R. § 351.525(b).  However, none of these attribution rules provides a regulatory basis for attributing the subsidies received by Precision and four of TPCO's subsidiaries to the sales of other subsidiaries.

Changbao submitted its questionnaire response on behalf of itself and Precision. See Questionnaire Response of Jiangsu Changbao Steel Tube Co., Ltd. and Jiangsu Changbao Precision Steel Tube Co., Ltd., PD 110 (July 20, 2009).  Commerce found that Changbao and Precision are cross-owned companies that produce subject merchandise and attributed the subsidies received by Precision to Changbao's sales and vice versa pursuant to 19 C.F.R. § 351.525(b)(6)(ii).  See Final Decision Memo at 7–8 (citing Prelim.

Results, 74 Fed. Reg. at 47,215).   Commerce additionally found that Changbao is a parent company and attributed the subsidies received by Changbao to the consolidated sales of Changbao and all of its subsidiaries pursuant to 19 C.F.R. § 351.525(b)(6)(iii). Final Decision Memo at 8.    Based on a combined application of 19 C.F.R. § 351.525(b)(6)(ii) and (iii), Commerce attributed the subsidies received by Precision not only to Changbao's sales, but also to the sales of Changbao's other subsidiaries.  Id.

For TPCO, Commerce attributed the subsidies received by four of TPCO's subsidiaries to the consolidated sales of TPCO and all of its subsidiaries.   TPCO submitted its questionnaire response on behalf of itself and four of its subsidiaries.  See TPCO's Response to the Department of Commerce's CVD Questionnaire, PD 111 (July 21, 2009).  The subsidiaries are Tianjin Pipe Iron Manufacturing Co., Ltd. ("TPCO Iron"); Tianguan Yuantong Pipe Product Co., Ltd. ("TPCO Yuantong"); Tianjin Pipe International Economic and Trading Co., Ltd. ("TPCO IETC"); and TPCO Charging Development Co., Ltd. ("TPCO Charging").   Commerce found that TPCO is a parent company to these subsidiaries and attributed the subsidies received by TPCO to the consolidated sales of TPCO and all of its subsidiaries pursuant to 19 C.F.R. § 351.525(b)(6)(iii).  See Final Decision Memo at 9 (citing Prelim. Results, 74 Fed. Reg. at 47,215).   Commerce additionally attributed the subsidies received by these four subsidiaries to TPCO's sales: (1) pursuant to 19 C.F.R. § 351.525(b)(6)(iv) because TPCO Iron produced an input used in TPCO's production of subject merchandise; (2) pursuant to § 351.525(b)(6)(ii) because TPCO Yuantong produced subject merchandise during the period of investigation; (3) pursuant to § 351.525(c) because TPCO IETC was a trading company exporting subject

merchandise; and (4) pursuant to 19 C.F.R. § 351.525(b)(6)(v) because TPCO Charging transferred steel rounds at LTAR to TPCO.  See id. (citing Prelim. Results, 74 Fed. Reg. at 47,215).   Commerce then attributed the subsidies received by TPCO Iron, TPCO Yuantong, TPCO IETC, and TPCO Charging to the consolidated sales of TPCO and all of its subsidiaries through a joint application of multiple attribution rules because Commerce determined that the subsidies received by these four subsidiaries are attributable to TPCO and TPCO is a parent company.  See id. (citing Prelim. Results, 74 Fed. Reg. at 47,215).

      As previously discussed, 19 C.F.R. § 351.525(b)(6)(iii) authorized Commerce to attribute subsidies received by Changbao and TPCO to each of their sales as well as the sales of each of their subsidiaries.  Commerce was additionally authorized to attribute subsidies received by Precision to Changbao and those received by TPCO's four subsidiaries to TPCO because Commerce found that one of the enumerated attribution rules under 19 C.F.R. § 351.525 was met.  However, Commerce's regulations do not authorize Commerce to attribute subsidies received by Precision and TPCO's four subsidiaries to the sales of Changbao's and TPCO's other subsidiaries.

      Commerce claimed that it had authority to attribute subsidies received by Precision and TPCO's four subsidiaries to the sales of Changbao's and TPCO's other subsidiaries pursuant to 19 C.F.R. § 351.525(b)(6)(iii).  That regulation states that "[i]f the firm that received a subsidy is a holding company, including a parent company with its own operations, [Commerce] will attribute the subsidy to the consolidated sales of the holding company and its subsidiaries."  19 C.F.R. § 351.525(b)(6)(iii).  Commerce stated that

because the subsidies received by Precision are attributable to Changbao (and those received by TPCO's four subsidiaries are attributable to TPCO), Commerce was authorized to additionally attribute these subsidies to sales of Changbao's (and TPCO's) other subsidiaries under 19 C.F.R. § 351.525(b)(6)(iii).  This attribution rule allows Commerce to attribute subsidies received by a parent company to the consolidated sales of the parent company and its subsidiaries.  However, the plain language of the regulation does not give Commerce authority to additionally attribute subsidies received by a subsidiary to the consolidated sales of the parent company's other subsidiaries.

The correct method for attributing a subsidy here was dictated by which company received the subsidy.  Commerce could not attribute subsidies received by one of Changbao's or TPCO's subsidiaries to other subsidiaries pursuant to 19 C.F.R. § 351.525(b)(ii), (b)(iv), (b)(v), or (c) by way of § 351.525(b)(6)(iii) because the latter is limited to subsidies received by a parent company.  The subsidies at issue here were not received by Changbao or TPCO.  The subsidies were received by Precision, TPCO Iron, TPCO Yuantong, TPCO IETC, and TPCO Charging.  Thus, contrary to Commerce's claim in its final determination, 19 C.F.R. § 351.525(b)(6)(iii) did not grant Commerce authority to attribute these subsidies to the sales of Changbao's and TPCO's other subsidiaries. On remand, Commerce must explain what authority allows it to attribute subsidies received by subsidiaries in this manner or reconsider its attribution methodology with respect to Precision and TPCO's four subsidiaries.

### C.   Commerce's Decision Not to Tie the Provision of Steel Rounds and Billets for LTAR Only to TPCO's Sales of Steel Pipe

U.S. Steel argues that Commerce was required to attribute the benefit received by TPCO from the provision of steel rounds at LTAR only to TPCO's sales of seamless steel pipe products, including OCTG, as opposed to TPCO's consolidated sales because the subsidy was tied to sales of such products.  See U.S. Steel Mot. 19–24.  U.S. Steel claims that the tying regulation applied because the steel rounds provided by the GOC were intended to benefit only TPCO's sales of steel pipe.  Id. at 19.  Defendant responds that Commerce properly attributed the provision of steel rounds at LTAR to TPCO's consolidated sales rather than tie the benefit only to its sales of seamless steel pipe.  See Def. Resp. 107–10.

"If a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product."  19 C.F.R. § 351.525(b)(5)(i).  To determine whether a subsidy is tied to a particular product, Commerce "analyze[s] the purpose of the subsidy based on information available at the time of bestowal," not what a company ultimately uses the funds for after they have been received.  See Countervailing Duties, 63 Fed. Reg. 65,348, 65,403 (Dep't Commerce Nov. 25, 1998).

Commerce has failed to explain its decision not to tie the provision of steel rounds and billets at LTAR only to sales of seamless steel pipe.  Because TPCO is a parent company, Commerce found that 19 C.F.R. § 351.525(b)(6)(iii) clearly applied, which instructs Commerce to attribute subsidies received by a parent company to the sales of that company and its subsidiaries.  Id.  Commerce additionally found that "[a]t the same

time, the facts in this case indicate that the regulation governing the attribution of subsidies tied to a particular product, 19 CFR [§] 351.525(b)(5), may also be applicable." Id.  Thus, Commerce found that two of the attribution rules may apply to TPCO, 19 C.F.R. § 351.525(b)(5) and (b)(6)(iii).   Commerce acknowledged that multiple attribution rules may apply to a particular company.  See Final Decision Memo at 129.  However, without even determining whether the provision of steel rounds at LTAR was tied to the production of seamless steel pipe, Commerce attributed the subsidy to TPCO's consolidated sales because 19 C.F.R. § 351.525(b)(6)(iii) clearly applied while it was less clear that 19 C.F.R. § 351.525(b)(5) also applied.  Id.

The court is unable to discern whether Commerce in fact made a determination that the provision of steel rounds at LTAR is not tied to sales of seamless steel pipe in deciding to attribute the subsidy to TPCO's consolidated sales.  It is likewise unclear whether Commerce determined that the subsidy is tied to sales of seamless steel pipe, but found it impossible to harmoniously apply 19 C.F.R. § 351.525(b)(5) and § 351.525(b)(6)(iii).  Commerce ultimately applied 19 C.F.R. § 351.525(b)(6)(iii) because it found that "it is less clear that the product tying regulation under 19 CFR [§] 351.525(b)(5) is also applicable." Id.  Commerce was required to determine whether the subsidy was tied to the production of seamless steel pipe.  Without making such a determination, Commerce's decision to attribute the subsidy to TPCO's consolidated sales is unsupported by substantial evidence.  On remand, Commerce must determine whether the tying regulation applies to TPCO based on the record of this case.

**VI.    Commerce's Decision Not to Use Facts Otherwise Available and Apply
        Adverse Inferences to Jianli's Purchases of Steel Rounds and Billets**

Maverick challenges Commerce's decision not to use AFA in calculating Jianli's

steel round purchases.  See Maverick Mot. 42–49.  Maverick argues Jianli's failure to

report steel rounds and billet purchases from a certain supplier justified using AFA.  See

id.  Defendant argues that Commerce reasonably declined to apply AFA.  See Def. Resp.

123–28.

Commerce must use facts otherwise available to make determinations under

certain circumstances.[35]  See 19 U.S.C. § 1677e.  If Commerce finds a party did not act

"to the best of its ability to comply with a request for information," Commerce may use an

adverse inference in selecting from among the facts otherwise available.   19 U.S.C.

§ 1677e(b).   Thus, the statute grants Commerce's considerable discretion to apply

adverse inferences in selecting among the facts otherwise available.

Commerce reasonably declined to exercise its discretion to apply AFA to Jianli.  At

verification, Commerce requested that Jianli provide records for select purchases of steel

rounds and billets from certain months and suppliers during the period of investigation.

See Verification Report: Jianli Group at 11, CD 104 (Oct. 28, 2009) ("Jianli Verification

Report").  Commerce traced the sample purchases from Jianli's reported steel rounds

purchases to Jianli's records, and at no point did Commerce discover any unreported

---

[35] More specifically, Commerce shall use facts otherwise available where "necessary information
is not available on the record," or a party "withholds information that has been requested by
[Commerce] . . . [or] significantly impedes a proceeding."  19 U.S.C. § 1677e(a).

purchases.[36]  See Jianli Verification Report at Attach. 1 at Ex. 10; Final Decision Memo

at 126.  Commerce also requested original mill certificates for all steel rounds and billets

purchased during the period of investigation.  See Jianli Verification Report at 10–11.  Out

of the mill certificates provided by Jianli, Commerce selected five mill certificates at

random to confirm that the suppliers were reported in Jianli's reported purchases.  See

Jianli Verification Report at 10–11.  One of the randomly selected mill certificates listed

[[                              ]] as a supplier, from which Jianli had not reported purchasing

steel inputs.  See Jianli Verification Report at 11.  Jianli explained in its case brief that this

discrepancy results from to the fact that [[                              ]] is the parent company

of [[                              ]], and both companies are listed on the mill

certificate and Jianli reported these purchases as purchases from [[

                    ]].[37]  See Jianli Group's Case Brief at 9 n.6, Attach. 1, CD 114 (Nov. 9,

---

[36] As requested, Jianli provided original records to substantiate its reported purchase information for randomly selected suppliers and months during the period of investigation.  See Verification Agenda/Schedule – Jianli Group, CD 93 (Oct. 9, 2009).  At verification, Commerce reviewed (1) bank receipts for pre-payments to suppliers, (2) ledgers for each supplier showing pre-payment entries, (3) value added tax invoices and quality certificates for purchases from each supplier, and (4) vouchers and corresponding credit entries.  See Jianli Verification Report at 11, Attach. 1 at Ex. 10.

[37] Initially, Commerce accepted statements made by Jianli company officials that [[          ]] is an alternative English spelling of [[          ]] as a satisfactory explanation for the discrepancy.  See Jianli Verification Report at 11.  Maverick argues that this explanation is false and was an attempt to mislead Commerce in its verification process.  See Maverick Mot. 43–44.  However, Jianli rectified any erroneous statement made by its officials at the first opportune moment in its case brief where Jianli explained that [[          ]] is the parent company of [[          ]] and both companies are named on the mill certificate.  See Jianli Group's Case Brief at 9 n.6, Attach. 1, CD 114 (Nov. 9, 2009).  Commerce accepted this explanation and found that "Jianli has not failed to cooperate or comply in any way."  Final Decision Memo at 126.

2009).   Despite this inconsistency, Commerce was satisfied with the accuracy and completeness of Jianli's reported information.  Final Decision Memo at 126.

Maverick argues that the existence of the [[                                        ]] mill certificate indicates that there are purchases that were not reported.   Maverick Mot. 45–46. However, Commerce accepted Jianli's explanation that the rounds produced by [[

                        ]] were reflected in Jianli's reported purchases from [[

            ]].   See Final Decision Memo at 126; Jianli Group's Case Brief at 9 n.6, Attach. 1, CD 114 (Nov. 9, 2009).

Maverick further contests the reliability of Jianli's reported purchases of steel rounds and billets.   See Maverick Mot. 47–49.   Maverick notes that many of Jianli's purchases are from suppliers that are subsidiaries of a common parent company.  See id. (citing Jianli Group's First Supplemental Questionnaire Response at Ex. S-11, CD 44 (Aug. 21, 2009)).   Maverick argues that Jianli is inexplicably not listed as one of the parent company's largest customers in an annual report even though Jianli's combined steel purchases from the subsidiaries would make Jianli the [[      ]] largest customer of the parent company.  See id. at 48; see also Pre-Preliminary Comments at Ex. 7 at 12, CD 52 (Aug. 25, 2009).   Commerce addressed this purported discrepancy and found that Jianli's absence from a third party's annual report did not warrant the application of AFA. See Final Decision Memo at 126.   Commerce examined a representative sample of Jianli's purchases and mill certificates, and Commerce was able to verify the accuracy and completeness of Jianli's information.   Commerce found that Jianli provided all necessary information and was cooperative.   Thus, Commerce disagreed that the

statutory requirements for applying AFA were met.  Commerce's refusal to exercise its discretion and apply AFA is reasonable.

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's final determination is sustained with respect to the following decisions: (i) to defer its investigation into certain new subsidy allegations until the first administrative review; (ii) not to initiate an investigation into allegations of export restraints on steel rounds and billets, land-use rights provided to Changbao at LTAR, and a steel mill and equipment provided to Changbao at LTAR; (iii) to include LME benchmark data in its benchmark calculation for steel rounds and billets; (iv) not to adjust the benchmarks used to reflect premium quality steel rounds and billets; (v) to exclude the special equipment surcharge from the steel round and billet benchmarks; (vi) to attribute subsidies received by Changbao and TPCO to each of their consolidated sales; and (vii) not to apply AFA to Jianli for its purchases of steel rounds and billets; and it is further

**ORDERED** that Commerce's final determination is remanded for Commerce to clarify or reconsider: (i) its use of China's WTO accession date as a uniform cut-off date for identifying and measuring subsidies; (ii) its attribution methodology for subsidies received by Precision and TPCO's four subsidiaries; (iii) its decision to include Jianli's freight quote in the benchmark price for steel rounds and billets; and (iv) its decision not to tie the benefit received by TPCO from the provision of steel rounds and billets at LTAR to sales of seamless steel pipe; and it is further

**ORDERED** that Defendant's remand request is granted for Commerce to recalculate the benchmark for steel rounds without the SBB East Asia pricing data; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.


                                              /s/ Claire R. Kelly
                                              Claire R. Kelly, Judge

Dated: June 24, 2016
        New York, New York